**In re The PEARSON BROS. COMPANY, INC., Debtor.**

**The PEARSON BROS. COMPANY, INC., Plaintiff,**

v.

**Leland PEARSON, Defendant.**

**Bankruptcy No. 183–01968. Adv. No. 86–8390.**

United States Bankruptcy Court, C.D. Illinois.

April 5, 1989.

Ronald R. Peterson, Jenner & Block, Chicago, Ill., for plaintiff.

D.J. McRae, Don J. McRae & Associates, Kewanee, Ill., for defendant.

Randall Moon, Asst. U.S. Trustee, Peoria, Ill.

## OPINION AND ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The debtor is engaged in the business of manufacturing farm equipment. The defendant founded the debtor and prior to its reorganization was its only shareholder, its chief executive officer, and one of its directors. Also prior to its reorganization, the defendant's brother, Vernon Pearson (Vernon), had retired from the debtor and was working part time in exchange for expenses, and LaVerne Charlet (Charlet), a long time key employee, was still working for the debtor. In November of 1983 the debtor had incurred substantial debt, much of which had been guaranteed by the defendant, and when it was unable to meet its obligations the debtor filed a Chapter 11 proceeding, and the defendant filed his individual Chapter 11 proceeding.

Originally, the defendant's goal was to save his interest in the debtor through a reorganization. Subsequently, he began to consider the alternative of selling his interest in the debtor to a third party. Gerald Gidwitz (Gidwitz) learned that the debtor was possibly for sale, and in the summer of 1984, there was a meeting attended by the defendant and Gidwitz' representative, James Stearns (Stearns). This initial meeting was exploratory in nature and no definite proposals were discussed. However, on several occasions the defendant told Stearns he did not wish to work for a reorganized debtor. Consequently, there was no discussion of a salary for the defendant should Gidwitz acquire the debtor. Exploratory type meetings between Gidwitz and the defendant continued during July of 1984. As a result of these meetings, the defendant decided to sell his interest in the debtor. At this stage there had not been any negotiations concerning defendant's continued relationship with a reorganized debtor and the compensation to be paid to him.

In August of 1984, the pace and intensity of the negotiations increased. On August 2, 1984, a special meeting of the debtor's board of directors was held. All but one of the directors, including the defendant, were present at that meeting. One of the directors was Wallace L. Edwards (Edwards), president of Superior Gear Box, one of the debtor's creditors. Also present were the debtor's corporate counsel and the debtor's special reorganization counsel. Stearns was present on behalf of Gidwitz and made a presentation to the board which included a proposal whereby Gidwitz would pay $50,000.00 to the debtor in exchange for new common stock and make payments to certain secured and unsecured creditors, with the defendant and Vernon receiving Fourth Class Preferred Stock in the face amount of $250,000.00 to be redeemed with 10% of the operating profits before federal tax beginning after the secured classes were fully redeemed, and defendant being employed in his staff capacity.

The meeting then moved in and out of formal and informal status. The informal portions of the meeting were attended by Stearns, the defendant, corporate counsel, special reorganization counsel, and Edwards. It was the feeling of the board, including Edwards, that the defendant should receive something to recognize that he was the founder of the debtor and had received a low salary over the years. The defendant also wanted to be paid something for his interest in the debtor and indicated that he did not want to work for a reorganized debtor. Stearns had no opposition to a payment to the defendant but indicated that it could not just be an outright payment and that the defendant would have to provide some services in exchange for any payment. Negotiations ensued and it was agreed in principal that the debtor would be paid in exchange for the defendant agreeing to act as a consultant to the reorganized debtor and a covenant not to compete. An agreement in principal was reached. Stearns indicated that the agreement had to be reduced to writing and the defendant felt he needed to review a written agreement.

Stearns recognized that the defendant was not to be a full time employee. Stearns wanted the defendant to be available to consult, but not spend so much time and be so visible that creditors would feel the defendant still had an active role in a reorganized debtor. Stearns felt that too much activity and visibility would project an undesirable image. At this stage it was the defendant's understanding that he would have to consult in exchange for any payment, but that his efforts would be minimal and that he would be consulting primarily on pending products liability law suits. Stearns wanted to spell out a number of hours that the defendant would provide consulting, but the defendant didn't.

The agreement in principal also contemplated the defendant signing a covenant not to compete. It was the defendant's understanding that the covenant was to be limited to products then being produced by the debtor and not applicable to products that would be developed post-confirmation. There never was any discussion of any geographic or time terms for the covenant. It was the defendant's understanding that he just wouldn't compete. Stearns felt that Gidwitz could live with that kind of arrangement.

When the board of directors went back into their last formal session, they adopted a resolution which in principal adopted the plan as presented by Stearns with eight revisions. Under this revised plan, Gidwitz was to acquire new common stock to be issued by the debtor, with the defendant receiving some preferred stock. In addition, the defendant was to have the option to acquire certain assets of the debtor. Charlet was to receive a consulting agreement in exchange for $10,000.00 per year for a period of five years. Additional provisions concerning the defendant and Vernon were as follows:

Leland and Vernon Pearson together will receive a consulting agreement (to be divided as they shall agree among themselves), which shall provide for the payment of $45,000.00 per year for a period of 15 years.

In addition to the consulting agreement, Leland and Vernon Pearson shall be entitled to receive the same employee benefits such as pension, health insurance and the like, afforded to the companies' other employees.

The minutes of that meeting reflect that as to "Technical Matters" the attorneys for Gidwitz and the debtor were to proceed with the drafting and filing of a plan of arrangement and that the debtor's attorneys were further authorized and directed to prepare all ordinary and necessary ancillary documents involved with the agreement of the parties.

On August 27, 1984 the debtor filed a second amended plan of reorganization and an amended disclosure statement. Section F of the Disclosure Statement provided in part as follows:

1. *Leland Pearson and Vernon Pearson*

Provided they can establish ownership rights, both Leland Pearson and Vernon Pearson will retain their personal property currently in the possession of the Debtors, including personal effects, machines, and tools. Leland Pearson will receive title to a 1981 Oldsmobile automobile with over 160,000 miles of use which is currently owned by the Debtors but used by Leland Pearson. In addition, Leland Pearson and Vernon Pearson will be paid a consulting fee in the total amount of $45,000 per year for a period of 15 years and will continue to receive the fringe benefits currently enjoyed by other senior management personnel. Both Leland Pearson and Vernon Pearson will be required to execute an agreement not to compete with the Debtors' business and to be available to management to perform specific business assignments. Leland Pearson and Vernon Pearson will receive an option to purchase at the lower of book value or market value the inventory related to the so-called "Spyder" business. This business concerns a personal project of Leland Pearson and involves the import and sale of articulated back hoes. Finally, Leland and Vernon Pearson will receive an option to purchase from the Debtors a

certain cement plant in Galva, Illinois for possible use in the Spyder business, provided that the Debtors shall not sell the cement plant without the Bank's approval.

2. *LaVerne Charlet*

LaVerne Charlet, a minority shareholder and present employee of IME, will receive a consulting fee of $10,000 per year for a period of 5 years. LaVerne Charlet will be required to execute an agreement not to compete with the Debtors' business and to be available to management to perform specific business assignments.

The defendant was also to receive 260,000 shares of Class D Preferred stock.

On September 21, 1984, there was another meeting of the debtor's board of directors, attended by the defendant. At this meeting the minutes of the previous meeting were approved, in particular those minutes approving the plan of reorganization, and the board of directors adopted a resolution authorizing the officers of the debtor to execute a Stock Purchase Agreement with Gidwitz. The defendant did not raise any objection to the reorganization or the minutes or any of the documentation proposed at this meeting.

On October 1, 1984, a series of events occurred. A confirmation hearing was held, attended by the defendant and Gidwitz' representatives. No one objected to the confirmation of the plan as filed. The plan was confirmed and the debtor and Gidwitz entered into the Stock Purchase Agreement. Gidwitz made the investment called for by the Stock Purchase Agreement and took over the management of the debtor. Vernon and Charlet signed agreements as presented to them and started to receive payments.[1] The defendant received certain personal property and also the "Spyder" business. However, he did not receive the preferred stock nor did he and the debtor sign a consulting agreement or a covenant not to compete. The defendant's personal bankruptcy was dismissed and he was released from all the institutional guarantees.

During a two year period after the plan of reorganization was confirmed, the reorganized debtor and the defendant continued to negotiate, but could not reach an agreement on specific terms for the consulting agreement and the covenant not to compete. During the period of negotiations the debtor continued to operate, but the defendant did not provide any consulting services to the debtor. The defendant contends that he made himself available but that the tasks assigned were outside the scope of the agreement as evidenced by the disclosure statement. The defendant has not received any payments as contemplated by the disclosure statement.

Finally on December 5, 1986, the debtor filed an adversary complaint seeking a declaratory judgment that the debtor no longer has any obligation to the defendant, and conversely that the defendant has no longer any obligation to the debtor because:

a. The parties did not enter into an oral contract on August 2, 1984;

b. Even if the parties did enter into an oral contract on August 2, 1984, such contract is unenforceable by virtue of the Statute of Frauds;

c. The disclosure statement does not constitute a written contract between the parties;

d. The parties never executed a written contract;

e. The defendant is barred by the doctrine of equitable estoppel from denying that the only written contract that could exist was the agreement tendered to him on September 29, 1984, the terms of which he refused to abide by and consequently breached.

The defendant filed a counterclaim seeking a declaratory judgment which

a. Declares that the agreements reached between the defendant and the debtor are valid and enforceable agreements providing for payment of a consulting fee to the defendant and fringe benefits as enjoyed by other

---

1. Vernon is receiving $7,000.00 per year, Charlet $10,000.00 per year.

senior management personnel from and since the date of the confirmation of the plan;

b. Declares the non-competitive agreement offered by the defendant for execution, or any substantially similar agreement, was and is within the understanding and terms of the Disclosure Statement and the agreements of the parties;

c. Declares that the debtor is indebted to the defendant for all consulting fees accrued from the date of the confirmation of the Plan to the date of order of this Court, together with interest thereon, and is indebted to him for the value of lost fringe benefits provided for in said agreements;

d. Declares an award of reasonable attorneys' fees; and

e. For such other and further relief as the Court deems just.

The positions of both the debtor and the defendant miss the mark. Prior to reorganization, the debtor and the defendant were in poor financial condition. To bring about an effective reorganization, an infusion of capital and change of management were required. After lengthy negotiations, the debtor reached an agreement with Gidwitz. As the minutes of the board meeting reflect, a "deal was struck." The infusion of capital took the form of Gidwitz' $50,000.00 investment. Gidwitz brought in new management. The change of management was to be facilitated through the usual format of providing a payment to the defendant in exchange for his agreeing to consult and not to compete. The intent was to get money to the defendant for a minimal consulting effort and an agreement not to compete. In addition, the proposed plan of reorganization provided that the debtor's creditors were to receive cash,

new notes or new preferred stock or a combination thereof. Both sides went forward and proceeded to confirm and implement the Plan without having all the documentation executed. This was done, even though they were knowledgeable businessmen and were represented by experienced and knowledgeable counsel.

■ The debtor now suggests that the disclosure statement was deceptive in that it failed to indicate the defendant was getting $645,000.00 for nothing. This argument overlooks the fact that Gidwitz's attorney helped to draft the disclosure statement, and that one of the debtor's creditors sat on the board of directors and was aware of the proposed payment to the defendant and worked to achieve that end. Notwithstanding those facts, however, the time to question the accuracy of the disclosure statement has long passed.

■ The reorganized debtor also comes before this Court claiming that it never had a contract with the defendant. This Court simply cannot agree. The debtor's second amended plan of reorganization, the stock purchase agreement, and the consulting/noncompetition agreements, including the one at issue here, all constituted one integrated contract—"a package deal." *See Rudd v. Parks*, 588 P.2d 709 (Utah 1978). An essential part of the bargain was the provision for the defendant. The defendant was a pioneer in the industry and preventing him from competing with the new debtor was very significant.

■ The relief the debtor seeks—to extricate itself from part of that bargain—is not available. Rather, what occurred in this case is that the debtor and the defendant entered into, in part, "an agreement to agree," and the issue is what this Court should do when they have failed to agree.[2]

___

2. While there may not have been an explicit "agreement to agree" between the debtor and the defendant, there was at least a tacit understanding that any remaining details would be ironed out. For the most part, however, the essential terms had been agreed to. Merely because a written agreement was to be entered into does not defeat the parties' oral agreement. As section 27 of the Restatement of Contracts (2d) indicates:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations. It is not necessary, as suggested by the debtor in retrospect, that every conceivable point be cov-

Farnsworth, *Contracts,* Section 3.29, Little, Brown & Company (1982) contains an extensive discussion of an "agreement to agree." This discussion begins by the author noting that:

> Particularly perplexing problems of indefiniteness are posed when the parties make what purports to be an enforceable agreement but leave one or more terms to be fixed by later agreement between them. (Footnote omitted.)

This is true in this particular case. It is not possible to set aside the whole transaction and return the parties to their original position. The Plan has been confirmed, creditors relied on a new status for the reorganized debtor, the defendant has been released from his guaranties, and the debtor has been revitalized and made profitable. Nor is it appropriate that the debtor be entitled to retain the business without making the payments contemplated by the parties, or for the defendant to receive the full payments even though he has not performed any consulting services or agreed not to compete, which is important to the debtor. Neither party should emerge from this litigation without assuming some responsibility for the confusion they helped to create.

Why the parties entered into an "agreement to agree" cannot be determined with absolute certainty. However, this Court believes that they were unwilling to take the time to bargain over the terms of the agreement and covenant not to compete before proceeding with confirmation and wished to postpone these negotiations until after that had occurred.

What they expected to happen if they failed to agree is totally unclear. In this type of situation the courts have traditionally refused to enforce agreements unless all the terms are present. However, inroads have been made into this traditional approach. For example, the Uniform Commercial Code treatment of open price term governed by Section 2–305, Ill.Rev.Stat., 1987, Ch. 26, para. 2–305. Other examples can be found in *Purvis v. United States ex rel Associated Sand & Gravel Co.,* 344 F.2d 867 (9th Cir.1965), where the court supplied the compensation term for concrete work supplied by the subcontractor where he undertook to do the work subject to future agreement; in *Rego v. Decker,* 482 P.2d 834 (Alaska 1971), where an option to purchase land left security for payment of price to agreement, the case was remanded to allow the trial court to condition a decree of specific performance by seller on buyer furnishing "adequate security", and in *Chesapeake & O. Ry. v. Herringer,* 158 Ky. 267, 164 S.W. 948 (1914), where the contract for use of land by a railroad, left a crossing at a place subject to agreement, the case was remanded for the lower court to fix point for crossing.

Although there has been a reluctance on the part of courts to extend this approach, it is appropriate that it be extended in this particular case. As previously pointed out, the parties went forward and completed the reorganization without having all their agreements executed, and for the reasons previously noted it would be unfair in these circumstances not to enforce their "agreement to agree".

■ Turning first to the Consulting Agreement, the debtor argues that the key period of time for its utilization was the first two years of the reorganized debtor's operation. This argument has merit as in the usual buy out where old management is replaced by new, there is a normal expectation that old management will help to establish continuity of operations by providing consulting during the initial stages of the transfer. However, this argument must be balanced with the recognition that the debtor did not want the defendant to be too conspicuous in his continued activities with the debtor. The debtor was in bankruptcy and it would be important to creditors and customers to know that new management was in control. Furthermore, the defendant wanted to pursue the "Spyder" business and to minimize his ongoing efforts on behalf of the debtor. Balancing these considerations, the defendant should have been available for the first two years,

ered. It is the parties who draw the parameters of their agreement.

with minimal availability thereafter. The initial two year period passed without the defendant providing any consulting services. Thereafter, to date, he failed to provide even minimal service. From this point forward, considering their failure to agree and possible ill will arising out of litigation, it would be difficult to require the defendant to provide meaningful consulting services even on a minimal basis—as the saying goes, "You can lead a horse to water, but you can't make it drink."

■ However, as to the Covenant not to Compete, it has more lasting benefit to the debtor and can be enforced. The length of the covenant would be the length of the payments, which the parties acknowledge was agreed to be fifteen years. The geographic area should be that area where the debtor was doing business at the time of confirmation. As to the product line, the Covenant not to Compete should extend to all products manufactured by the debtor at the time of confirmation or any extension thereof. It should not apply to the "Spyder" business or any of the other businesses which the defendant retained or any extension thereof. Nor should it apply to any new product line developed by either debtor or defendant.

■ Considering that the defendant has not provided any consulting services and it would be difficult to require the defendant to provide meaningful consulting services in the future, that the Covenant not to Compete has value to the debtor, that both parties are at fault in allowing this situation to develop, and recognizing that it is difficult to quantify what should be paid to the defendant, it is both appropriate and fair in these circumstances to split the anticipated payments. The mathematics should be as follows: $45,000.00 per year, less $7,000.00 per year being paid to Vernon, resulting in $38,000.00 a year being available for the defendant; one-half of which would be $19,000.00. There shall be an immediate payment to the defendant of $76,000.00, for the years 1985 through 1988, and the debtor shall make eleven annual payments of $19,000.00 each, beginning in November, 1989.

IT IS, THEREFORE, ORDERED that

1. The debtor shall immediately pay to the defendant the sum of $76,000.00, and shall also pay the sum of $19,000.00 per year for eleven years, beginning in November, 1989.

2. The debtor and the defendant shall enter into a Covenant not to Compete consistent with the findings in this Opinion and Order. This Court retains jurisdiction to resolve any differences should the parties be unable to agree.

3. The debtor shall provide the defendant with the same employee benefits as afforded the company's other employees.

4. The debtor shall supply to the defendant Fourth Class Preferred Stock in the face amount of $250,000.00 to be redeemed 10% of the operating profit before federal tax, beginning after the secured classes are fully redeemed.

This Opinion and Order is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.