The PEARSON BROS. COMPANY,
INC., Appellant/Cross–Appellee,

v.

Leland PEARSON,
Appellee/Cross–Appellant.

No. 89–1124.

United States District Court,
C.D. Illinois,
Peoria Division.

April 13, 1990.

Ronald R. Peterson, Chicago, Ill., for appellant/cross-appellee.

Don J. McRae, Kewanee, Ill., for appellee/cross-appellant.

## ORDER

MIHM, District Judge.

Before the Court is an appeal by Pearson Bros. Company, Inc. and a cross-appeal by Leland Pearson. The District Court has jurisdiction for this appeal under to 28 U.S.C. § 158(a). This Court affirms the decision of the bankruptcy court, 98 B.R. 427, but for different reasons than those given by the bankruptcy court.

## STATEMENT OF THE ISSUES

The first issue is whether the parties intended to agree to make an agreement to later execute a consulting/non-compete agreement.

The second issue is whether the agreement to agree constitutes a contract which is definite enough to enforce under Illinois law.

The third issue is whether, if the contract is too indefinite to be enforced, the Court can fashion an equitable remedy based upon promissory estoppel or based upon the federal policy favoring finality in Bankruptcy Reorganization Plans which have been approved.

## APPLICABLE STANDARD OF REVIEW

Bankruptcy Rule 8013 provides that the findings of fact of the bankruptcy court shall not be set aside unless they are clearly erroneous. The District Court may review the bankruptcy court's conclusions of law de novo. *Matter of Excalibur Automobile Corp.*, 859 F.2d 454 (7th Cir.1988).

## BACKGROUND

The Pearson Bros. Company (hereinafter the "Debtor") is engaged in the business of manufacturing farm equipment. Leland Pearson founded the Debtor and prior to its reorganization was its only shareholder, its chief executive officer, and one of its directors. Also, at the time of the Debtor's reorganization, Leland Pearson's brother, Vernon Pearson, had retired from the Debtor and was working part-time in exchange for expenses, and LaVerne Charlet, a long time key employee, was still working for the Debtor. In November of 1983, the Debtor had incurred substantial debt, much of which had been guaranteed by Leland Pearson. When the Debtor was unable to meet its obligations, the Debtor filed a Chapter 11 proceeding, and Leland Pearson filed his individual Chapter 11 proceeding.

Originally, Leland Pearson's goal was to save his interest in the Debtor through a reorganization. Subsequently, he began to consider the alternative of selling his interest in the Debtor to a third party. Gerald Gidwitz learned that the Debtor was possibly for sale. In the summer of 1984, Leland Pearson and James Stearns, a representative of Gidwitz, attended a meeting. This initial meeting was exploratory in nature and no definite proposals were discussed. However, on several occasions Leland Pearson told Stearns he did not wish to work for a reorganized Debtor. Consequently, there was no discussion of the salary for Leland Pearson should Gidwitz acquire the Debtor. Exploratory type meetings between Gidwitz and Pearson continued during July of 1984. As a result of these meetings, Pearson decided to sell his interest in the Debtor. At this stage there had not been any negotiations concerning Leland Pearson's continued relationship with the reorganized Debtor and the compensation to be paid to him.

In August of 1984, the pace and intensity of the negotiations increased. On August 2, 1984, a special meeting of the Debtor's Board of Directors was held. All but one of the Directors, including Leland Pearson, were present at the meeting. One of the Directors was Wallace L. Edwards, President of Superior Gear Box, one of the Debtor's creditors. Also present were the Debtor's corporate counsel and the Debtor's special reorganization counsel. Stearns was present on behalf of Gidwitz and made a presentation to the Board which included a proposal whereby Gidwitz

would pay $50,000 to the Debtor in exchange for new common stock and make payments to certain secured and unsecured creditors, with Leland Pearson and Vernon Pearson receiving fourth class preferred stock in the face amount of $250,000, to be redeemed with ten percent of the operating profits before federal tax beginning after the secured classes were fully redeemed. Leland Pearson would also be employed in a staff capacity under this proposal.

The meeting then moved in and out of formal and informal status. The informal portions of the meeting were attended by Stearns, Leland Pearson, corporate counsel, special reorganization counsel, and Edwards. It was the feeling of the Board, including Edwards, that Leland Pearson should receive something to recognize that he was the founder of the Debtor and to recognize that he had received a low salary over the years. Leland Pearson also wanted to be paid something for his interest in the Debtor and indicated that he did not want to work for the reorganized Debtor. Stearns had no opposition to a payment to Leland Pearson but indicated that it could not just be an outright payment and that Leland Pearson would have to provide some services in exchange for any payment. Negotiations ensued and it was agreed in principle that the Debtor would be paid in exchange for Pearson's agreeing to act as a consultant to the reorganized Debtor and in return for a covenant by Pearson not to compete. [NOTE: The bankruptcy court found that an agreement in principle was reached at this point]. Stearns indicated that the agreement had to be reduced to writing and Pearson felt he needed to review a written agreement.

Stearns recognized that Leland Pearson was not to be a full-time employee. Stearns wanted Pearson to be available to consult, but he did not want Pearson to spend so much time and be so visible that the creditors would feel that Pearson still had an active role in the reorganized Debtor. Stearns felt that too much activity and visibility would project an undesirable image. At this stage, it was Pearson's understanding that he would have to consult in exchange for any payment, but he understood that his efforts would be minimal and that he would be consulting primarily on pending products liability lawsuits. Stearns wanted to spell out the number of the hours that Pearson would provide consulting, but Pearson did not spell out the number of hours he would work.

Although the agreement in principle contemplated that Pearson would sign a covenant not to compete, it was Pearson's understanding that the covenant was to be limited to products then being produced by the Debtor and not applicable to products that would be developed after confirmation of the sale by the bankruptcy court. There never was any discussion of any geographic or time terms for the covenant. It was Pearson's understanding that he just would not compete. Stearns felt that Gidwitz could live with that kind of arrangement.

When the Board of Directors went back into their last formal session, they adopted a resolution which in principle adopted the plan as presented by Stearns, with eight revisions. Under this revised plan, Gidwitz was to acquire new common stock to be issued by the Debtor, with Pearson receiving some preferred stock. In addition, Pearson was to have the option to acquire certain assets of the Debtor. Charlet was to receive a consulting agreement in exchange for $10,000 per year for a period of five years. Additional provisions concerning Leland Pearson and Vernon Pearson were as follows:

> Leland and Vernon Pearson together will receive a consulting agreement (to be divided as they shall agree among themselves), which shall provide for the payment of $45,000 per year for a period of fifteen years.

> In addition to the consulting agreement, Leland and Vernon Pearson shall be entitled to receive the same employee benefits such as pension, health insurance and the like, afforded to the company's other employees.

The minutes of that meeting reflect that as to "Technical Matters" the attorneys for Gidwitz and the Debtor were to proceed with the drafting and filing of a plan of

arrangement and that the Debtor's attorney were further authorized and directed to prepare all ordinary and necessary ancillary documents involved in the agreement of the parties.

On August 27, 1984, the Debtor filed a second amended plan of reorganization and amended disclosure statement. Section F of the disclosure statement provided in part as follows:

> 1. *Leland Pearson and Vernon Pearson*
>
> Provided they can establish ownership rights, both Leland Pearson and Vernon Pearson will retain their personal property currently in the possession of the Debtor, including personal effects, machines, and tools. Leland Pearson will receive title to a 1981 Oldsmobile automobile with over 160,000 miles of use which is currently owned by the Debtors but used by Leland Pearson. In addition, Leland Pearson and Vernon Pearson will be paid a consulting fee in the total amount of $45,000 per year for a period of fifteen years and will continue to receive the fringe benefits currently enjoyed by other senior management personnel. Both Leland Pearson and Vernon Pearson will be required to execute an agreement not to compete with the Debtor's business and to be available to management to perform specific business assignments. Leland Pearson and Vernon Pearson will receive an option to purchase at the lower of book or market value the inventory related to the so-called "Spyder" business. This business concerns a personal project of Leland Pearson and involves the import and sale of articulated backhoes. Finally, Leland and Vernon Pearson will receive an option to purchase from the Debtors a certain cement plant in Galva, Illinois for possible use in the Spyder business, provided that the Debtor shall not sell the cement plant without the bank's approval.
>
> 2. *LaVerne Charlet*
>
> LaVerne Charlet, a minority shareholder, and present employee of IME, will receive a consulting fee of $10,000 per year for a period of five years. LaVerne Charlet will be required to execute an agreement not to complete with the Debtor's business and to be available to management to perform specific business assignments.

Leland Pearson was also to receive 260,000 shares of class D preferred stock.

On September 21, 1984, there was another meeting of the Debtor's Board of Directors, attended by Leland Pearson. At this meeting, the minutes of the previous meeting were approved, in particular, those minutes approving the plan of reorganization. Also, the Board of Directors adopted a resolution authorizing the officers of the Debtor to execute a stock purchase agreement with Gidwitz. Leland Pearson did not raise any objection to the reorganization or minutes or any of the documentation proposed at this meeting.

On October 1, 1984, a series of events occurred. A confirmation hearing was held, attended by Leland Pearson and Gidwitz's representatives. No one objected to the confirmation of the plan of reorganization as filed. The plan was confirmed by the court, and the Debtor and Gidwitz entered into the stock purchase agreement. Gidwitz made the investment called for by the stock purchase agreement and took over the management of the Debtor. Vernon Pearson and Charlet signed agreements as presented to them and started to receive payments. Vernon Pearson is receiving $7,000 per year and Charlet is receiving $10,000 per year. Leland Pearson received certain personal property and also the Spyder business. However, he has not received the preferred stock nor did he and the Debtor sign a consulting agreement or a covenant not to compete. Leland Pearson's personal bankruptcy was dismissed and he was released from all of the institutional guarantees.

During a two year period after the plan of reorganization was confirmed, the reorganized Debtor and Leland Pearson continued to negotiate, but could not reach an agreement on specific terms for the consulting agreement and the covenant not to complete. During the period of negotia-

tions, the Debtor continued to operate, but Leland Pearson did not provide any consulting services to the Debtor. Leland Pearson contends that he made himself available but that the tasks assigned were outside the scope of the agreement as evidenced by the disclosure statement. Leland Pearson has not received any payments as contemplated by the disclosure statement.

Finally, on December 5, 1986, the Debtor filed an adversary complaint seeking a declaratory judgment that the Debtor no longer had any obligation to Leland Pearson and, conversely, that Leland Pearson no longer had any obligation to the Debtor because:

> the parties did enter into an oral contact on August 2, 1984; even if the parties did enter into an oral contract on August 2, 1984, such contract is unenforceable by virtue of the Statute of Frauds; the disclosure statement does not constitute a written contract between the parties; the parties never executed a written contract; and Leland Pearson is barred by the doctrine of equitable estoppel from denying that the only written contract that could exist was the agreement tendered on September 29, 1984, the terms of which he refused to abide by and consequently breached.

Leland Pearson filed a counterclaim seeking a declaratory judgment which declares:

> (1) that the agreements reached by himself and the Debtor are valid and enforceable agreements providing for payment of a consulting fee to himself and fringe benefits as enjoyed by other senior management personnel from the date of the confirmation of the bankruptcy plan;
> (2) that the non-competitive agreement offered by himself for execution, or any substantially similar agreement, was and is within the understanding and terms of the disclosure statement and the agreements of the parties;
> (3) that the Debtor is indebted to Leland Pearson for all consulting fees accrued from the date of confirmation of the bankruptcy plan to the date of the order of this Court, together with interest thereon, and is indebted to him for the value of lost fringe benefits provided for in said agreements;
> (4) that he should be awarded reasonable attorney's fees.

### THE BANKRUPTCY OPINION

The bankruptcy court ordered the Debtor to pay Pearson $76,000 immediately and to pay $19,000 a year for eleven years. Further, the court ordered the Debtor and Pearson to enter into a covenant not to compete consistent with the findings of the court, and the court ordered the Debtor to provide Pearson with the same employee benefits as given to other company employees. Lastly, the court ordered the Debtor to supply Pearson with fourth class preferred stock in the face amount of $250,000 to be redeemed in ten percent of the operating profit before federal tax, beginning after the secured classes are fully redeemed.

The bankruptcy court concluded that the minutes of the Board meeting of the Debtor and the confirming of the reorganization plan reflect that a deal was struck and that there was a contract. Further, the bankruptcy court concluded that the Debtor's second amended plan of reorganization, the stock purchase agreement, and the consulting/non-competitive agreements, including the one at issue here, all constituted one integrated contract—"a package deal." *See, Rudd v. Parks*, 588 P.2d 709 (Utah 1978). The Court concluded that the Debtor could not extricate itself from the part of the bargain involving the consulting/non-competition agreement and cash payments which were to be given to Pearson by the Debtor because the Debtor had accepted the rest of the deal. In addition, the court decided that although the Debtor and Pearson had not worked out all of the details of the consulting/non-competitive agreements, they had entered into "an agreement to agree." Section 27 of the Restatement of Contracts Second; Farnsworth, *Contracts*, § 3.29 Little, Brown and Company (1982).

Also, the court noted that it is not possible to set aside the whole transaction and return the parties to their original position because the bankruptcy plan has been confirmed, creditors relied on a new status for the reorganized Debtor, Pearson has been released from his guarantees, and the Debtor has been revitalized and made profitable. The court concluded that it would not be appropriate that the Debtor be entitled to retain the business without making the cash payments to Pearson as contemplated by the parties, and the court determined that it would be unfair for Pearson to receive the full payments because he has not performed any consulting services or agreed not to compete, which is important to the Debtor. In sum, the court concluded that both parties should assume some responsibility for the confusion they created. Although the court noted that traditionally courts have refused to enforce agreements unless all of the terms are present, today often the courts will supply missing terms when they are persuaded that the parties intended to reach an agreement. *See,* Uniform Commercial Code § 2–305, Ill.Rev. Stat. ch. 26 ¶ 2–305; *Purvis v. United States ex rel. Associated Sand & Gravel Co.,* 344 F.2d 867 (9th Cir.1965); *Rego v. Decker,* 482 P.2d 834 (Alaska 1971); *Chesapeake & O. Ry. v. Herringer,* 158 Ky. 267, 164 S.W. 948 (1914).

*Whether the Parties Intended to Agree to Agree*

■ First, the Debtor contends that the bankruptcy court totally ignored the undisputed evidence that Leland Pearson refused to sign the consulting/non-competition agreement tendered to him before the plan confirmation even though his own attorney believed it accurately reflected the parties' agreement with some "ministerial" changes. (R. 90 B.—94 B.). Therefore, the Debtor contends that the parties never intended to agree to be bound.

Pearson, in response, argues that there was clearly an offer by the Debtor and an acceptance by Leland Pearson. The Gidwitz stock acquisition plan was presented to the Board of Directors on August 2, 1984. The August 2, 1984 minutes state that after, "marathon negotiations", a "deal was struck." The deal is detailed in the minutes of the meeting specifying the 8 revisions that would have to be made to the plan of reorganization to incorporate the agreement. (Joint Exhibit 1 at 3–4). The agreement was passed by the unanimous vote of the Board of Directors, with board member Leland Pearson present. (Joint Exhibit 1 at 1–4). Thereafter, the amended joint disclosure statement was drafted reiterating at Section F, Part 1, the 8 points set out in the August 2, 1984 minutes. (Joint Exhibit 5 at 23–24). The Board of Directors approved the disclosure statement, (Joint Exhibit 2, resolution attached), and it was submitted for approval by the bankruptcy court. The President of the five companies signed both the August 2, 1984 minutes and the disclosure statement and Leland Pearson approved both documents by his vote as a Board of Director member, reflected in the Board minutes on August 2, 1984 and September 21, 1984.

This Court agrees with Pearson and the bankruptcy court and finds that there was an offer and acceptance. The consideration was clearly set out in both the August 2, 1984 minutes and in Section F, Part 1 of the disclosure statement. Leland Pearson and Vernon Pearson were to receive $45,000 per year for a period of 15 years and continue to receive the fringe benefits currently enjoyed by other senior management personnel. In exchange, the Debtor was to receive: (1) a non-compete agreement from Leland and Vernon Pearson and (2) their consulting services. However, none of the terms of these agreements are set out. In sum, this Court agrees with the bankruptcy court and believes that the parties clearly intended to enter into a contract.

*Whether the Agreement is Definite Enough to be Enforced*

The Debtor contends in this appeal that the bankruptcy plan, the stock purchase agreement, and differing unsigned drafts of the consulting/non-competition agreement cannot be considered as a "package" which constitutes one contract because they do not contain terms that are definite enough to be enforced.

■ Under Illinois law, an "agreement to agree" exists when the parties enter into what appears to be an enforceable contract but leave one or more terms to be fixed by later agreement. Farnsworth, *Contracts*, § 3.29, Little, Brown & Company (1982). The bankruptcy court found that the parties had entered into an agreement to agree and that the terms not agreed to were non-essential matters that the parties failed to agree on at the time of the original bargaining because they were unwilling to take the time to do so. (Bankruptcy Opinion at 10, n. 2, 12). The bankruptcy court supplied the missing terms for the parties.

■ The Debtor claims that the Seventh Circuit has long discouraged courts from supplying missing contract terms. In *National Tea Company v. Weiss*, 341 F.2d 331, 334 (7th Cir.1965), the court stated:

[u]ntil the parties agree on the fundamental and material items basic to the agreement, there was no enforceable contract.... Under the guise of construction, the district court could not itself write a contract for the parties covering the missing essential elements.

*See also, Lees v. Akshun Manufacturing Co.*, 205 F.2d 577, 578 (7th Cir.1953) (Agreement stating that the parties "will endeavor to work out an agreement" containing certain minimum provisions held unenforceable."). This approach has been followed in other circuits as well. *See, Transamerica Equipment Leasing Corp. v. Union Bank*, 426 F.2d 273, 274 (9th Cir.1970) ("An oral or written contract is not established because the parties left essential terms to future negotiations"). The Debtor contends that where an agreement is not sufficiently definite to enable a court to give it exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result. This Court agrees.

Even further, the Debtor notes that there could not be an enforceable agreement without resolution of the essential elements of a contract because a court cannot create standards out of whole cloth. *See, Magid Manufacturing Co. v. U.S.D.*

*Corp.*, 654 F.Supp. 325, 332–333 (N.D.Ill. 1987). (Court held no agreement existed where parties failed to discuss and agree on termination standards, performance standards or extent and types of services to be provided). In *Magid, Id.* at 333, the court stated that terms such as duration and sales quotas are considered essential terms of an agreement between a manufacturer and a distributor. In this case, although the disclosure statement and August 2, 1984 Board minutes lay out the salary of $45,000 over 15 years which is to be paid to Leland and Vernon Pearson, there is no indication as to what the terms of the consulting/non-competitive agreement might be.

In addition, the Debtor claims that the bankruptcy court failed to address the controlling precedent in the Seventh Circuit, particularly *United States v. Orr Construction Company*, 560 F.2d 765 (7th Cir. 1977). The Debtor argues that in *Orr* the Seventh Circuit refused to enforce an "agreement to agree" for two primary reasons—the court found that the parties' agreement to enter into "proper legal releases" as part of the settlement of a lawsuit was too indefinite to be enforced and that subsequent conduct of the parties proved they had different interpretations of what constituted "proper legal releases." *Id.* at 769–771.

The *Orr* case seems to be directly on point. Pearson, Stearns, and others engaged in negotiations on August 2, 1984 regarding Leland Pearson's future compensation and regarding the non-competition and consulting agreements. The Debtors concede that, as reflected in the disclosure statement, the parties agreed on the total amount of compensation that would be paid to Leland and Vernon Pearson. However, although the parties had some discussion regarding the particulars of the consulting and non-competition agreements and agreed to execute such agreements in the future, when the Debtor drafted such an agreement and Leland Pearson rejected it, it became apparent that the parties had measurably different views regarding the

material terms and conditions of the consulting and non-competition agreements.

The court in *Orr* found that the term "proper legal releases" was so ambiguous that the settlement could not be enforced because it was evident that the parties had never had a meeting of the minds. *Id.* at 770. Pearson argues that the *Orr* case is distinguishable from the present case because the *Orr* dispute was over the key and essential term of the agreement, not the "technical matters" of the contract. Pearson asserts that the Debtor's Board of Directors clearly set out the basic terms of the agreement, and, in the August 2, 1984 minutes of the meeting, they directed the attorneys to iron out the remaining issues in the section of the minutes labeled "Technical Matters." (*See,* Joint Exhibit 1 at 4).

Further, Pearson claims that the Debtor's arguments overlook that the court in *Orr* stated there were two ways to find the requisite definiteness in a contract:

(1) If the language of the contract itself gives a definite meaning whether based on linguistic interpretation or an industry practice; or

(2) That the subsequent conduct of the parties indicates they reached a meeting of the minds even if the contractual language was ambiguous, the court can find an enforceable contract.

*Id.* at 769–770. Pearson asserts that in *Orr* there were multiple claims of action, and the settlement agreement did not denote which claims and which parties would be released. Also, Pearson asserts that in *Orr* the ambiguity in the essential term of their settlement was such that no reasonable conclusions could be drawn from the language of the settlement itself or from parol evidence to resolve the dispute.

This Court does not believe that this case is factually distinguishable from *Orr*. This case clearly involved a meeting of the minds, unlike *Orr*, as this case involved an announced intention to agree to agree later. However, the terms of the agreement in this case are too indefinite to enforce. This is not a case where the parties would agree on a "reasonable" price later which the Court could infer from market prices. In this case, there are no standards to help the Court fill in the missing terms. The language of the disclosure statement gives no indication what the terms of the non-compete and consulting agreement would consist of except for the compensation to be paid to Leland Pearson over 15 years. The nature of the non-compete and consulting agreement is such that, without more terms than price and duration, a court cannot reasonably fashion a legal remedy. Of course, whether the Court could fashion an equitable remedy under an equitable theory is a different question. In this case, there is no basis upon which to fashion a legal remedy because the language of the alleged contract is too indefinite, because there is no indication that an industry practice gives the terms of this alleged contract definiteness, and because the subsequent conduct of the parties only seemed to show that the parties had not actually agreed on the terms of this contract.

Pearson contends that even though the parties clearly envisioned the later execution of a more formal agreement not to compete, under Illinois law, contemplation of the execution of a formal agreement in the future does not render the prior agreement a mere negotiation where the parties intended to be bound and the initial agreement contained the essential elements of the transaction. *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224 (N.D.Ill.1976). In the *Evans* case, the federal district court applied Illinois law to determine whether an enforceable contract for a lease existed based upon a letter of intent that anticipated a further written agreement. The parties executed a letter of intent which set out the terms for the lease including the premises, the amount of rent, maintenance costs, remodeling, and taxes. The defendant then released an announcement of the lease agreement to the press, both parties expended a considerable sum in anticipation of performance, and Evans forewent other potential tenants in releasing the letter of intent. During the course of drafting the various documents for the transaction, the defendant began to reopen old

issues and raised new ones, and he eventually terminated negotiations. The court found that, while some matters required resolution, the letter of intent included all essential terms and reflected a positive intent to be bound. The court determined that all of the other remaining issues were susceptible to reasonable resolution by good faith negotiation.

Pearson contends that the case in hand closely parallels *Evans* in that the essential terms for the contract—parties, price, duration, and consideration—were set out in the disclosure statement and minutes of the Board meeting. This Court disagrees with Pearson and the bankruptcy court. Although the agreement in this case primarily involved the sale of a business (which has the elements necessary for a contract for sale), the consulting/non-competitive agreement were significant parts of the total package.

As far as the non-compete agreement is concerned, there is no specified duration, there is no specified geographic area, and the product lines which are to be included are not specified; therefore, the non-compete agreement is too indefinite to enforce.

As far as the consulting agreement goes, although one could argue that the compensation would be $45,000 for Leland Pearson less whatever Vernon receives, and that the place of performance would obviously be the place of the Debtor's business, the nature and extent of consulting services which Pearson was to provide in this case is not at all clear. Even though a court might be able to imply reasonable compensation and even imply the place of performance if it knew the nature and extent of the services which were agreed on, this court cannot imply the terms of the consulting work because there are too many unresolved factors involved in determining the nature and extent of services to be provided. This Court is unwilling and unable to imply the nature and extent of services to be provided in this case.

■ A contract does not exist if the essential terms are vague or omitted. *Champaign National Bank v. Landers Seed Co.*, 116 Ill.Dec. 742, 744–745, 519 N.E.2d 957, 959–960, 165 Ill.App.3d 1090 (4th Dist.1988). This Court believes that the essential terms of a non-competition agreement include its subject matter and geographical area. *See, Akhter v. Shah*, 74 Ill.Dec. 730, 733–734, 456 N.E.2d 232, 235–236, 119 Ill.App.3d 131 (1st Dist.1983) (subject matter of non-compete must be reasonable as to time and territory). In *Akhter*, the court held that the covenant not to compete was unenforceable because it did not specify any time duration.

In sum, this contract or agreement to agree cannot be enforced in law because this Court is unable to fashion a legal remedy based upon the parties' intent.

## PROMISSORY ESTOPPEL

■ In the alternative, Leland Pearson asserts that the doctrine of promissory estoppel creates an implied contract in this case. Leland Pearson claims that the Debtor in this case is promissorily estopped from denying his claim based upon the disclosure statement's terms of $45,000 per year for 15 years. Leland Pearson acknowledges that Vernon Pearson is paid $7,000 per year and that Leland would accept the remaining $38,000 as compensation. The Restatement of Contracts provides in § 90 as follows:

A promise which the promissor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promissee which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

This is a doctrine whereby a party may recover without the presence of a contract and Illinois courts have allowed suits based on promissory estoppel. *Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co.*, 45 Ill.Dec. 876, 413 N.E.2d 209, 90 Ill.App.3d 768 (3rd Dist.1980).

■ Four elements establish promissory estoppel. There must be (1) an unambiguous promise, (2) reliance upon the promise, (3) foreseeable reliance, and (4) reliance to the promissee's injury. *Gerson Electric*

*& Construction Co. v. Honeywell, Inc.*, 72 Ill.Dec. 851, 453 N.E.2d 726, 117 Ill.App.3d 309 (1st Dist.1983).

This Court believes that it is undeniable that on August 2, 1984 the Debtor at a stockholder meeting drafted a disclosure statement to reflect the terms of the meeting which promised Leland Pearson and his brother jointly $45,000 per year for 15 years plus the same benefits that the senior management employees in exchange for being available to consult and an agreement not to compete. Pearson contends that these terms were arrived at after lengthy negotiations and were necessary to provide the acceptance of the Board of Directors of the Gidwitz plan and the cooperation of Leland Pearson in accepting the plan. Further, Pearson asserts that his reliance was certainly foreseeable because these terms were set after lengthy negotiations which put the terms in writing and the terms were voted on by the Board of Directors and placed in a disclosure statement.

Pearson contends that he also relied on those terms because he accepted the reorganization plan under which, in return for compensation, his 100 percent stock ownership in the Debtor was to be canceled and ownership transferred to Gidwitz. Pearson claims that in order to pass the Gidwitz plan, it was necessary to include the provisions for the benefit of Leland and Vernon Pearson because the Board of Directors, which included Leland Pearson at that time, would not have accepted it without those changes. Even further, Pearson asserts that he accepted the plan of reorganization and attended the confirmation hearing with no objections based upon the written proposed contract of the disclosure statement. He contends that he made no objection at the confirmation hearing because he felt that he and the Debtor were bound by the terms of the minutes of the disclosure statement.

Lastly, Leland Pearson claims that he has relied to his detriment as, upon confirmation of the bankruptcy plan, Leland Pearson's common stock was canceled so that he lost all ownership in the Debtor company, which cancellation negated any bargaining power he had to negotiate the new terms for a contract.

From the Court's review of the record, it clearly appears that Leland Pearson has established promissory estoppel. The Court believes that there is an adequate record to support a finding that Leland Pearson be given the entire amount he is claiming of $38,000 a year. It is clear from the record that Leland Pearson has never competed against the Debtor over the last five years. Also, it appears that Pearson did in fact lose negotiation power after the confirmation hearing so that the Debtor began asking for terms which were clearly harsher than contemplated by the disclosure statement. In fact, it appears that the earlier agreement, which Pearson refused to sign because there were a few discrepancies in the contract, was never again presented to Pearson because he had lost this bargaining power. However, based upon the fact that the bankruptcy court found that both parties in the case were at fault, presumably for failing to negotiate in good faith, the bankruptcy court found that $19,000 per year should be given to Leland Pearson. The bankruptcy court's finding in this regard is supported in the record.

The Debtor's assert in their reply brief that the alleged promises, if any, were extremely ambiguous, assuming that they existed at all. They claim that Pearson's argument that the ambiguity requirement is relaxed and that a lesser standard is required to prove promissory estoppel to prove a contract is unsupportable because promissory estoppel is an equitable remedy. Further, they point out that Pearson can cite no legal authority to support his point that the legal standard is relaxed.

It may be that Pearson has cited no authority where the ambiguity requirement is relaxed; however, equity exists to provide remedies where injustice would be done without a remedy. In this case, it seems clear that an injustice would be done in allowing one party to induce another party to sell their business built over a lifetime and then to provide them no reme-

dy because the contract was ambiguous. Second, technically, the doctrine of promissory estoppel requires only that there be a promise unambiguous in its terms. *See, Goldstick v. ICM Realty,* 788 F.2d 456, 462 (7th Cir.1986). In this case clearly there was a promise which was unambiguous in its terms. The promise was to pay Leland and Vernon Pearson $45,000 a year for 15 years. The doctrine of promissory estoppel does not appear to require that the return performance requested be unambiguous.

The Debtor contends that the assertion of reliance by Pearson that the Board of Directors would not have accepted the Gidwitz plan without the compensation package for Leland has never been established by the testimony of any of the witnesses. Although there is no direct testimony on this issue, it clearly seems to be a reasonable inference from the record that the Board would not have accepted the Gidwitz plan if a compensation package had not been created for Leland and Vernon Pearson. A company going into bankruptcy generally does not hand out gratuities without a reason.

The Debtor argues that Leland Pearson's stock was valueless and that the Gidwitz organization did not have to buy Leland's worthless stock in order to gain control. The Debtor argues that 11 U.S.C. § 1121 allows creditors to file a plan of reorganization and cancel existing stock and issue new stock which is in fact what happened in the case at bar.

Even if the stock was worthless, a business can have value as a going concern. Further, the cooperation of Leland Pearson in acquiring a going concern was obviously worth something to the Debtor, as otherwise they would not have offered to pay him. If Pearson had simply filed a Chapter 11 reorganization and the assets had been sold, the Gidwitz organization may not have acquired the Debtor as a going concern.

Lastly, the Debtor claims that Leland Pearson is estopped from claiming damages because of his refusal to execute an agreement prior to the plan confirmation or to speak up at the plan confirmation and at the closing of the sale of his company.

This Court rejects this argument also because the bankruptcy court found that both parties were at fault in this case. Leland Pearson did not sign the agreement which was presented to him prior to the plan confirmation as he believed there were some ministerial matters which needed to be worked out. At this point, Pearson had every right to believe that the parties were already bound by the Disclosure Statement, which had already been adopted by the board of the Debtor, to negotiate over the terms in good faith. However, he failed to realize that the Debtor would never present the same deal to him again after he lost his bargaining power upon the approval of the bankruptcy plan.

Even further, this Court believes that current case law would allow a plaintiff to recover based upon reliance where a contract fails for indefiniteness. Farnsworth, E. Allen, *Contracts*, § 3.3 Mitigating Doctrines at 209, Little, Brown, and Company (1982); *Kearns v. Andree*, 107 Conn. 181, 187, 139 A. 695, 697 (1928); *Wheeler v. White*, 398 S.W.2d 93 (Tex. 1965); *Goodman v. Dicker*, 169 F.2d 684 (D.C.Cir.1948). In addition, the Seventh Circuit has discussed and approved of the use of promissory estoppel in a context where the contract failed for indefiniteness. *Goldstick v. ICM Realty*, 788 F.2d 456, 462–466 (7th Cir.1986); *Walters v. Marathon Oil Co.*, 642 F.2d 1098 (7th Cir. 1981).

This Court believes that there is an additional element of reliance in this case. In addition to the reliance on the promises of the Debtor, Leland Pearson has relied on the finality of his rights as they were determined in the bankruptcy reorganization plan which was confirmed by the bankruptcy court. In this case, denying Pearson a remedy might offend federal policies concerning the finality of rights already adjudicated in a bankruptcy proceeding.

Under the Bankruptcy Code, under Chapter 11 U.S.C. § 1141(a), the provisions of a confirmed plan of organization bind the debtor and all parties to the plan. 11

U.S.C. § 1142(a) further provides that the debtor "shall carry out the plan and shall comply with any orders of the court."

The Debtor's amended joint disclosure statement was approved by the bankruptcy court on August 27, 1984 and the second amended joint plan of reorganization was confirmed by the bankruptcy court on October 1, 1984. Prior to the confirmation of the plan, Leland Pearson was founder, chief executive officer, and 100% shareholder of Pearson Bros. The bankruptcy plan treated Leland Pearson's equity interest as a class XII claim. Class XII claimants receive nothing and upon confirmation of the bankruptcy plan their claims are extinguished. In this case, however, the disclosure statement further explained the plan for reorganization. It provided that Leland and Vernon Pearson would in part receive $45,000 per year for 15 years and continue to receive the fringe benefits of the other senior management personnel in exchange for their consulting services and a non-competition agreement. Pearson made no objections to the approval of the bankruptcy plan.

Although only the disclosure statement makes. provision for compensation to Leland Pearson, it is clear that the Debtor considered the disclosure statement as part of the bankruptcy plan for reorganization. The September 21, 1984 minutes of the Board of Directors unanimously adopted a resolution that provided:

> The Board of Directors of these corporations, at a meeting duly held on August, 1984, adopted resolutions approving a plan of reorganization, and embodied the Debtor's second plan of organization as described in Debtor's combined disclosure statement ...

(Joint Exhibit 2, Resolution attached). Further, the September 21, 1984, resolution of the Board of Directors authorized the officers of the Debtor to execute any instruments, including consulting agreements, with Leland Pearson, Vernon Pearson, and LaVerne Charlet necessary to carry out the agreement.

In addition, Pearson points out that the Debtor's original adversary complaint sought relief from the disclosure statement and bankruptcy plan claiming that Leland Pearson had breached his obligations set out in the plan and disclosure statement. (Complaint for Declaratory Relief filed December 5, 1986). It appears that the Debtor amended its Complaint changing its breach theory to a theory that there was no enforceable contract because there was no evidence of a breach by Pearson of the terms in the disclosure statement.

In *In re Astroglass Boat Company,* 32 B.R. 538 (Bkrtcy.M.D.Tenn.1983), the court ruled that a settlement between a creditor and the debtor recited in the confirmed plan was a judgment which barred the · creditor's later motion to allow its claim and damages inconsistent with the plan. The Debtor is now essentially attempting to alter its reorganization plan and disclosure statement by arguing that Leland Pearson is getting $650,000 for nothing. As the bankruptcy court noted, this ignores the fact that the Debtor's attorneys, Jenner & Block, drafted the disclosure statement and bankruptcy plan.

Further, even in the context of a modification, the bankruptcy court under the Bankruptcy Code, is required to consider and protect the interest of those parties who relied on the confirmation order. 11 U.S.C. § 1127(b).

As the disclosure statement must be considered as part of the reorganization plan, then, in this case, the policies of the Bankruptcy Code are implicated as well as the rights of the parties under the purported agreement. Thus, the Court believes that an additional ground which would support a finding of equitable reliance is reliance on the judgment of a bankruptcy court. The federal policies of finality and certainty, which are needed to promote successful bankruptcy reorganizations, are implicated after a reorganization has been confirmed. *See, In re Astroglass Boat Co., Inc.,* 32 B.R. at 543–544.

■ Further, the bankruptcy court, acting as a court of equity in enforcing an earlier judgment, has the power to fashion a remedy to do complete justice and to make the injured party whole. *Walters v.*

*Marathon Oil Co.,* 642 F.2d 1098, 1100 (7th Cir.1981); *United States v. Board of Education of City of Chicago,* 588 F.Supp. 132, 239 (N.D.Ill.1984); *Goldberg v. Medtronic, Inc.,* 686 F.2d 1219, 1229 (7th Cir.1982); *International Union, etc. v. Local Union No. 589,* 693 F.2d 666, 675 (7th Cir.1982).

This Court affirms the remedy granted by the bankruptcy court and adopts the bankruptcy court's reasoning to the extent it is consistent with this opinion. Although no remedy would be completely satisfactory to either party, the remedy given by the bankruptcy court equitably resolves this case. Both parties have relied on the bankruptcy reorganization plan. Even further, as the bankruptcy court noted, it is not possible to set aside the whole transaction and return the parties to their original position because the bankruptcy plan has been confirmed, the creditors relied on a new status for the Debtor, Pearson has been released from his guarantees, and the Debtor has been revitalized and made profitable.

### CONCLUSION

The decision of the bankruptcy court is AFFIRMED.

It is so ordered.